UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

    Plaintiff,

v.

PEOPLEMARK, INC.,

    Defendant.

Case No. 1:08-cv-907
HON. ROBERT J. JONKER

---

**MEMORANDUM IN SUPPORT OF DEFENDANT
PEOPLEMARK'S MOTION FOR SUMMARY JUDGMENT**

Defendant Peoplemark, Inc. ("Peoplemark") hereby files its Memorandum in Support of its Motion for Summary Judgment.

## INTRODUCTION

On behalf of itself, Sherrie Scott and "similarly situated African Americans" the Equal Employment Opportunity Commission ("EEOC") has sued Peoplemark in this action under Title VII, 42 U.S.C. § 2000e-5(f)(1) for allegedly having a policy that has an adverse impact on hiring African Americans. 42 U.S.C. § 2000e-2(a)&(k). Specifically, the EEOC's Complaint, filed September 29, 2008, alleges:

\*\*\*

> 7. Since at least May 2005, Defendant Employer has engaged in unlawful employment practices at all of its facilities in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a). The Defendant's unlawful employment practices include maintaining a policy which prohibits the hiring of any person with a criminal record. Such policy has had and continues to have a disparate impact on African American applicants.

> 8. The effect of the practices complained of in paragraph 7, above, has been to deprive Scott and similarly situated African Americans of equal employment opportunities and otherwise adversely affect their status as applicants for employment.

***

[DE 1]. The EEOC has elected to proceed against seven Peoplemark locations in four different states.[1]

Despite the EEOC's contention above that Peoplemark has a policy that excludes the hiring *of any person* with a *criminal record*, the EEOC has retreated from that position and now alleges that Peoplemark has a policy in which felony convictions are considered during the applicant phase, but individuals are not "categorically" excluded from hire based solely on the felony conviction. [DE 81 at 2-3]. EEOC appears to argue, therefore, that the policy in question is one in which "felony convictions" are considered, among other things, during the application process at Peoplemark. However, the EEOC is not even sure whether each facility utilizes conviction records in the same manner. [DE 81 at 2] ("[T]here is still a need to review data from all five Peoplemark locations, including applicant flow data and current work force data, and conduct an adverse impact analysis to determine whether the manner in which convictions are used *at each facility* has a disparate impact on African Americans [sic] applicants for those positions.") (emphasis added). In other words, the EEOC appears to be floundering and unsure of exactly what *specific* policy or practice it relies upon to establish a case of disparate impact under Title VII.

---

[1] The EEOC's initial investigation only focused on Peoplemark's Grand Rapids, Michigan location. Other locations that are the subject of this lawsuit are Owensboro, Kentucky; Orlando, Florida, which includes its Maitland office;

## LAW AND ARGUMENT

**A.  Summary Judgment is Appropriate for Disposition of this Case.**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255.

The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A dispute about a material fact is "genuine" within the meaning of Rule 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 258. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the non-moving party's position is required. *Id.* at 252.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1349 (6th Cir. 1991). The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324; *Cloverdale Equip. Co. v. Simon Aerials,*

---

and Memphis, Tennessee. Two other locations, which are no longer open, are Collierville, Tennessee and Livonia, Michigan.

*Inc.*, 869 F.2d 934, 937 (6th Cir. 1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Anderson*, 477 U.S. at 249; *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). In other words, the opponent of the motion cannot merely restate his conclusory allegations in affidavit form or presume the existence of material facts. *Mayberry v. Endocrinology-Diabetes Assocs.*, 926 F. Supp. 1315, 1322 (M.D. Tenn. 1996); *Robinson v. Union Carbide Corp.*, 805 F. Supp. 514, 523 (E.D. Tenn. 1991). ""In this circuit, 'this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."" *Thornton v. Federal Express Corp.*, No. 05-2247 B, 2007 WL 188573, at *3 (W.D. Tenn. Jan. 22, 2007) (quoting *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1994))).

B. **The EEOC cannot establish a *prima facie* case of disparate impact race discrimination under Title VII.**

The EEOC recognizes that to establish a *prima facie* case of disparate impact, it must:

> (1) identify a specific employment practice to be challenged; and (2) through relevant statistical analysis prove that the challenged practice has an adverse impact on a protected group. *Johnson v. U.S. Dep't of Health & Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994) (citing *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 907-08 (6th Cir. 1991)). Moreover, there must be a causal link between the disparate impact and the challenged employment practice. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 655-58 (1989). **Statistical evidence is used to show the causal link.** *Id.* at 650. Accordingly, **expert testimony is essential to the demonstration of a disparate impact discrimination case.** *EEOC v. Gen. Dynamics Corp.*, 999 F.2d 113, 117 (5th Cir. 1993) (district court's improper exclusion of expert testimony "was tantamount to dismissal of the EEOC's disparate impact claim").

4

[DE 81 at 1] (emphasis added). Despite the EEOC's knowledge that it must present statistical evidence through expert testimony in order to establish a *prima facie* case of disparate impact racial discrimination under Title VII, the EEOC has squandered away its opportunity to do so.

> *1.    The EEOC has not identified a **specific** employment policy or practice.*

As noted above, the EEOC no longer asserts that Peoplemark has a specific policy that "categorically" excludes individuals from hire if they have a criminal record. The EEOC now suggests that Peoplemark possibly uses *felony conviction* records in different manners at different locations to exclude African Americans from hire in a disproportional rate compared to white individuals. In fact, the EEOC acknowledges that certain Peoplemark locations have hired numerous individuals with criminal records. [DE 81 at 2].[2] *Cross v. U.S. Postal Serv.*, 639 F.2d 409, 410-11 (8th Cir. 1981) (finding that plaintiff failed to establish that her employer had a policy of rejecting applicants who had been criminally convicted when evidence showed that employer in fact hired some individuals with criminal records). Thus, Peoplemark argues that the EEOC cannot even meet this element of its *prima facie* case and, for that reason alone, summary judgment should be granted to Peoplemark.

In addition to the above, Peoplemark's expert, Malcolm S. Cohen, Ph.D., found that in his analysis of Peoplemark data there was evidence in every current office that Peoplemark hired "ex-offenders." *See Declaration of Malcolm S. Cohen and the Expert Report of Malcolm S. Cohen, Ph.D., (hereinafter "Cohen Report" attached hereto as Exhibit 1) at 3*. The deposition of Peoplemark's managers taken in this case by the EEOC supports Dr. Cohen's findings. In fact,

---

[2] Moreover, Dr. Janice Madden, the EEOC's would be statistician, noted in her second Declaration that Peoplemark collected information on education and job histories from their applicants, presumably because those characteristics were relevant to their hiring decisions. [DE 81, Exhibit E, *Second Declaration of Janice F. Madden* ("Madden Decl.") ¶5]. .

two of the only five alleged victims with whom the EEOC has claimed an attorney client privilege in this litigation, who are from Memphis, testified at their depositions that Peoplemark hired them knowing that they had felony convictions.[3] (Excerpts from the Deposition of Jerry Thomas (attached hereto as Ex. 2 and hereinafter referred to as "Thomas Dep.") pp.7-8 and Exhibit 1; Excerpts from the Deposition of Paul Brown (attached hereto as Ex. 3 and hereinafter referred to as "Brown Dep.") p. 6). Thus, Jerry Thomas testified that Peoplemark in Memphis hired him in 2004 or 2005 knowing that he had a prior felony conviction involving cocaine. (Thomas Dep. pp. 19-20, 25-26, 44). Paul Brown testified that Peoplemark hired him knowing that he had a prior felony conviction for aggravated assault. (Brown Dep. pp. 23, 30-31, 42, 43).[4] Further, Peoplemark's branch manger for Orlando and Maitland, Florida, Shaun Cady, testified that he routinely hired and placed felons for Peoplemark clients in Florida. (Excerpts from the Deposition of Shaun Cady (attached hereto as Ex. 4 and hereinafter referred to as "Cady Dep.") pp.17-19). Cady, who had worked at the Memphis branch before becoming a branch manager in Florida, testified that while in Memphis he hired and placed hundreds of felons. (Cady Dep. pp. 48-49). In fact, he hired and placed Thomas and Brown. (Cady Dep. pp. 51-52). He was not aware that Peoplemark had a policy of not hiring felons. (Cady Dep. pp. 58-59). Similarly, Joe Taylor, branch manager in Owensboro, Kentucky, testified that he also had hired and placed convicted felons. (Excerpts from the Deposition of Joe Taylor (attached hereto as Ex. 5 and hereinafter referred to as "Taylor Dep.") pp. 19-20).

---

[3] These five alleged victims are Sherri Scott, George Lucas, James Spearman, Jerry Thomas, and Paul Brown. (*See* Exhibit 1 of Thomas Dep.).

[4] These "victims" were also identified as such after Defendant's motion to compel was granted [DE 33] in response to Defendant's First Interrogatory, along with more than two hundred other persons in which the EEOC has claimed no privilege. Concerning Thomas and Brown, the EEOC acted in bad faith (or performed a woefully inadequate investigation) when it identified them as victims, claimed an attorney client privilege concerning them, thereby prohibiting counsel for Peoplemark from contacting them ex parte, and causing Peoplemark to expend

In addition, Dr. Cohen notes that there is no evidence to suggest that Peoplemark treats African Americans with criminal records any differently than whites with a criminal record, or African Americans without a criminal record any differently than whites without a criminal record. (Cohen Report p. 5). Also, in his review of the EEOC's expert (Dr. Pager) report, Dr. Cohen noted that Dr. Pager excluded in her study employers that had "occupations with legal restrictions on ex-offenders – such as jobs in the health care industry, work with children and the elderly, jobs requiring the handling of firearms (i.e. security guards), and jobs in the public sector." (*Id.* (quoting Pager report, p. 11)). In his analysis of Peoplemark data, Dr. Cohen determined that many of the jobs at Peoplemark fall into this category such as jobs at St. Jude's Children's Hospital in Memphis and job placements at the Seminole and Orange County public schools out of Orlando, Florida. (*Id.*)

Most notably, Dr. Cohen stated that because Peoplemark is a temporary employment agency, it must consider its clients' hiring needs. For example, if the client is a public high school it might not be able to accept ex-offenders by law. Likewise, if the client is a manufacturer of high value products for which the risk of theft might prove tempting, the client may not want to hire ex-offenders for security reasons. (Cohen Report p. 6). Moreover, Dr. Cohen noted the following that Dr. Pager initially included but omitted from her final report:

> "In decisions about worker placement, the issue of an applicant's criminal background is a relevant concern. As an employment agency, Peoplemark must identify workers who meet the needs of their employer clients. Given that most employers report a general wariness of hiring individuals with criminal records, it is not surprising that Peoplemark is reluctant to place such applicants."

---

time, effort and expense in deposing them, well knowing Thomas and Brown could not be victims because they were known felons who were assigned by Peoplemark.

7

*Id.* (quoting Dr. Pager; Pager draft Bates No: ExpertPager00015).[5] Nevertheless, as Dr. Cohen observed: "Peoplemark however merely accepts client orders as to what qualifications its [sic] wishes in its employees. Some employers have security or safety concerns that preclude ex-offenders. Others have no problem accepting ex-offenders." (*Id.*) Because Peoplemark's clients, coupled with very real legal concerns, dictate the type of workers Peoplemark ultimately ends up placing, the EEOC cannot point to a specific policy or practice – neutral on its face -- that has a disparate impact on African American applicants with felony convictions.

Therefore, because the EEOC cannot identify a specific policy or practice, summary judgment in favor of Peoplemark should be granted on this basis alone.

> 2. *The EEOC cannot prove through relevant statistical analysis that whatever the policy is that it is challenging has an adverse impact on African Americans.*

This Court, as have the parties, recognizes that the EEOC must prove its claim, in large part, through statistical analyses. [DE 101 at 1]. The EEOC cannot prove this critical element of its disparate impact claim. In a disparate impact Title VII case, "[o]nce the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988); *see also Adams v. Lucent Techs., Inc.*, 284 Fed. Appx. 296, 303 (6th Cir. 2008) (a prima facie case of disparate impact requires a showing of adverse impact through "'relevant statistical analysis,'" and a

---

[5] Dr. Pager submitted a draft section of her report that was not included in her final report served on Peoplemark. The EEOC produced this draft section in response to Peoplemark's First Request for Production of Documents and Electronically Stored Information. This omitted draft section was to be Section 4 (or Section D) of her report. It is attached hereto as Exhibit 6, along with the Declaration of Omar Weaver, counsel for the EEOC.

"'complete failure to make any such statistical showing is fatal to [a] claim.'") (quoting *Butts v. McCullough*, 237 Fed. Appx. 1, 9 (6th Cir. 2007)).

Significantly, in a disparate impact case, plaintiffs must do more than merely raise an inference of discrimination before the burden shifts to an employer to show business necessity; they "must actually prove the discriminatory impact at issue." *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993) (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990)). In the typical disparate impact case, in which the plaintiff argues that a selection criterion excludes protected applicants from jobs or promotions, the plaintiff proves discriminatory impact by showing statistical disparities between the number of protected class members in the qualified applicant group and those in the relevant segment of the workforce. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650 (1988), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074, *as recognized in Raytheon v. Hernandez*, 124 S. Ct. 513 (2003). Whether the protected group has been disadvantaged turns on quantifiable data. The plaintiff may not merely assert that the policy has harmed members of the group to which he or she belongs. Instead, the plaintiff must prove the existence of adverse effects of the policy, must prove that the impact of the policy is on terms, conditions, or privileges of employment of the protected class, must prove that the adverse effects are significant, and must prove that the employee population in general is not affected by the policy to the same degree. *Spun Steak*, 998 F.2d at 1486.

Here, the EEOC has not identified anyone who can introduce a relevant statistical analysis. Dr. Devah Pager has not been identified as a witness who is expert in statistical

analyses.[6] The EEOC had offered Dr. Janice Madden as an expert with her testimony limited to statistical analysis of disparate impact:

> Short Summary of Expected Testimony:
>
> Dr. Madden is expected to offer testimony regarding statistical analysis in support of the Commission's claim that African Americans are convicted of felonies at disproportionate rates and demonstrate the [sic] Peoplemark's policy has a disparate impact on African American Applicants.

[DE 84 at 3]. Nevertheless, the EEOC has failed to produce a timely report by Dr. Madden. For this reason, the EEOC cannot meet the second element of a *prima facie* case of disparate impact racial discrimination under Title VII and this Court should dismiss the EEOC's claim with prejudice.

The EEOC's burden is compounded by the fact that it has retreated from its position that Peoplemark has a policy that "categorically" denies employment to all persons convicted of a felony – a position that this Court noted that the EEOC had to have "some rudimentary statistical analysis" for. [DE 76, Ex. 1 at 40]. Now, as set forth above, it appears that the EEOC is acting on information and belief that Peoplemark's policy of *considering* felony convictions may, in some locations, for certain reasons, have an adverse impact on African-American applicants with felony convictions.

The EEOC itself acknowledges, though, that without being able to present relevant statistical proof on this issue, its case is doomed:

> The Court: In a case like this, you know, where at the time of the Complaint –

---

[6] Dr. Pager was designated by the EEOC to testify in the following areas: "Short Summary of Expected Testimony: Dr. Pager is expected to offer testimony regarding the existence of and reasons for statistical disparity of felony convictions of African Americans as compared to non-African Americans, how felony convictions affects reentry into the workplace; the effect of employment on the recidivism rate of ex-offenders; and how job performance of the positions in which Peoplemark places its employees is affected by felony convictions." *See* Exhibit 7

> Ms. Barno: Right.
>
> The Court: -- the Complaint says defendant's policy or practice is having a disparate impact. That's the theory of the case. That's clearly what the theory is. You know it's going to need statistical evidence. Why don't you have an expert online? I mean, don't you need that? Don't you have to have it?
>
> Ms. Barno: *We do, Your Honor*, but it's difficult between what we need and kind of what established protocols are within the agency.

[DE 76, Ex. 1 at 8] (emphasis added).

> Ms. Barno: \*\*\*
>
> Secondly, if we look at that standard as well, I think that the importance of the testimony is another issue, and clearly this is a disparate impact case, and *disparate impact cases rise and fall on statistical and expert testimony. Without our ability to present this expert [Madden], it will certainly have an irreparable and dispositive effect on our case.*

[DE 76, Ex. 1 at 25] (emphasis added).

> The Court: The Court noted that the Complaint was very simple and very straightforward. But I think clearly, as I noted in my nondocument order recently denying the defendant's motion to dismiss, I think the theory of the Commission was plainly stated. And it's a disparate impact theory based on a policy that Peoplemark allegedly has not to hire people with criminal records, and it's alleged to have a disparate impact on African-American people. It's a flat-out statement. It's not offered on information and belief, it's simply stated, which implies that there was, at least as of the time of filing of the Complaint, some rudimentary statistical analysis at a minimum. As there would have to be, because everybody knew, *certainly the EEOC knew as of the date of filing that Complaint, that the case would hinge on statistical evidence. Every disparate impact case does. And so the EEOC knew that.* And the EEOC certainly knew whatever its own internal procedures were with respect to facilitating the acquisition of appropriate experts.

[DE 76, Ex. 1 at 39-40] (emphasis added). Nevertheless, the EEOC failed to meet the Court's third extension to December 31, 2009 as the deadline for Dr. Madden's expert statistical analyses to be filed. [*See DE 101, aff'd, DE 108*]. Indeed, Dr. Madden explained in her Second Declaration that it was a labor economist's job to determine whether conviction records or some other characteristic influenced the likelihood of placement at Peoplemark. [DE 81, Ex. E, ¶¶ 5-10]; *see also EEOC v. Carolina Freight Carriers Corp.*, 723 F. Supp. 734, 753 (S.D. Fla. 1989)

11

(holding that employers can refuse to hire persons convicted of a felony and that "[e]mployers are not required to give preferences to minorities merely because of their protected status, but rather to hire *all* applicant's meeting the job's qualifications."); *see also Fletcher v. Berkowitz Oliver Williams Shaw & Eisenbrandt, LLP*, 537 F. Supp. 2d 1028, 1029-30 (W.D. Mo. 2008) (granting defendant's motion to dismiss because plaintiff could offer nothing more than general assertion that blacks are imprisoned at more than five times the rate of whites). Moreover, the *Fletcher* court noted that where the pleadings alleged a general policy against hiring or retaining employees with felony convictions, but then the plaintiff attempted to proceed with an edited rationale (much like the instant case) which is inconsistent with the alleged general policy, the case of *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) calls for dismissal of such case. *Fletcher*, 537 F. Supp. 2d at 1031-32 (citing cases). Based on this additional rationale, the EEOC's complaint should be dismissed with prejudice.

       3.    *There is No Adverse Impact on African American Applicants with Felony Convictions.*

Dr. Cohen[7] analyzed data furnished by Peoplemark on an Empact database to determine whether there was evidence of adverse impact at the Peoplemark locations[8] at issue in this case. Dr. Cohen explained that he used census codes and EEO job categories from the job orders and

---

[7] Dr. Cohen has a Ph.D. in Economics from MIT. He has also worked for the U.S. Bureau of Labor Statistics in Washington, D.C. Dr. Cohen has taught classes, including Statistics, Economics, Econometrics, Labor Market Information, and Human Resources Management at the Universities of Maryland, Michigan, and Minnesota. In addition, Dr. Cohen has written over 50 articles and books, many of which deal with hiring and hiring policy. He has also testified or been a consultant in over 1,000 audits or cases and testified hundreds of times. Dr. Cohen has served as an expert for the EEOC and Department of Labor in discrimination cases. Finally, Dr. Cohen has analyzed hundreds of establishments to determine whether there is adverse impact in hiring, promotions, terminations, job assignments, compensation, transfers or discipline. (Cohen Report p. 1-2 and Curriculum Vitae attached thereto).

[8] Each Peoplemark location maintained a computerized database that retains personnel information of applicants and persons assigned. This database was produced to the EEOC. The software for this database is called Empact. Dr. Cohen was unable to perform an analysis for the Owensboro location because of the unavailability of data and because the assignments were only kept in paper form in personnel files and did not always include the type position. (Cohen Report p. 10).

the counts and percentages of workers by relevant geographical area obtained from the U.S. Census Bureau's EEO-1 Tool to determine benchmarks. (Cohen Report p. 10-11). He then compared the benchmarks to the percentage of placed individuals who were African American to determine if Peoplemark's placements exceeded the census benchmark or were at least within 80% of the benchmark. (*Id.* at 11 & n.4). As set forth below, Dr. Cohen's analysis reveals no adverse impact against African American applicants and in only two categories did placements fall below the benchmark but even then were within 80%:

**Table 2: Benchmark Analysis**

| Grand Rapids | | | |
|---|---|---|---|
| EEO group | Benchmark | Placed: % Black | Placements Exceed Benchmark |
| Clerical (5) | 8.6% | 34.6% | yes |
| Operatives (7) | 13.0% | 31.6% | yes |
| Laborers (8) | 9.7% | 31.7% | yes |
| Orlando | | | |
| EEO group | Benchmark | Placed: % Black | Placements Exceed Benchmark |
| Clerical (5) | 17.5% | 39.4% | yes |
| Operatives(7) | 26.5% | 54.7% | yes |
| Laborers (8) | 28.9% | 53.3% | yes |
| Service (9) | 24.0% | 53.3% | yes |
| Livonia | | | |
| EEO group | Benchmark | Placed: % Black | Placements Exceed Benchmark |
| Clerical (5) | 54.5% yes | 75.9% | yes |
| Operatives (7) | 63.7% | 86.3% | yes |
| Laborers (8) | 41.9% | 71.6% | yes |
| Memphis* | | | |
| EEO group | Benchmark | Placed: % Black | Placements Exceed Benchmark |
| Clerical (5) | 59.8% | 54.0% | no (but exceed 80% rule) |
| Craft (6) | 41.9% | 34.1% | no (but exceed 80% rule) |
| Operatives(7) | 70.4% | 77.7% | yes |
| Laborers (8) | 66.9% | 94.6% | yes |
| Service (9) | 68.8% | 87.1% | yes |

*based on two month sample from May and October, 2008.

As Dr. Cohen concluded, "[W]hen a comparison is made of the percent of African American placements to the available labor pool, there is no evidence of any disparity." (Cohen Report p. 13). Based on Dr. Cohen's analysis, finding no disparate impact against African Americans in Peoplemark's hiring practices, summary judgment should be granted in favor of Peoplemark.

    4.    *Dr. Cohen's Analysis of Dr. Pager's Report Reveals that the EEOC has Failed to meet its Burden of Setting Forth Evidence of Disparate Impact.*

Besides preparing an adverse impact analysis based on relevant Peoplemark data, geographical information, and job groups, Dr. Cohen also opined on Dr. Pager's report and whether it was at all relevant to showing adverse impact against African American applicants with felony convictions at certain Peoplemark locations. First, Dr. Cohen listed the Objectives of what Dr. Pager was asked to do by the EEOC:

    a) Analyze conviction rates "to determine whether or not African Americans are disproportionately represented among those with felony convictions;"

    b) "Assess the extent to which a felony conviction reduces employment prospects and the extent to which the employment of ex-offenders is relevant to recidivism;" and

    c) "Analyze the educational and work histories of ex-offenders to better understand the labor market sectors in which they are likely to be most concentrated."

(Cohen Report p. 3). Even without getting into the specifics of Dr. Pager's report, Dr. Cohen noted that the objectives, while laudable, did not relate to or tend to prove the claims made by the EEOC against Peoplemark. In fact, Dr. Cohen noted that in the body of her report, Dr. Pager

14

mentions Peoplemark only four times. (*Id.* at 3-4). And, the remarks about Peoplemark were only general, vague statements. In sum, Dr. Cohen noted that "nothing in Dr. Pager's report or conclusions provides evidence that Peoplemark's hiring policies have a disparate impact on African Americans." (*Id.* at 4).

Without going through each example, it is worth noting some of the more significant findings made by Dr. Cohen based on his review of Dr. Pager's report. First, Dr. Cohen noted that Dr. Pager discussed a research study that she conducted and presented in her book, *Marked*. Significantly, in her book, Dr. Pager opines that "Testing for litigation requires multiple audits of the same employer . . . to detect consistent patterns of discrimination by that particular individual and/or company." (Cohen Report p. 5). Dr. Cohen notes that "[d]espite Dr. Pager's experience and knowledge in this area, no such study is reported as having been conducted at Peoplemark." *Id.* Moreover, Dr. Pager's "study" was based in five metropolitan areas which are not implicated in this lawsuit. (*Id.*) Dr. Cohen concludes that "it would be inappropriate to apply conclusions drawn based on Dr. Pager's study to the hiring practices of Peoplemark." (*Id.*)

Because of the absence of any relevant statistical study performed by Dr. Pager to Peoplemark's hiring practices and because even the objectives of her report are irrelevant to the claims in this lawsuit, the Court should grant summary judgment in favor of Peoplemark.

C. **Even if a disparate impact could be flushed out of Dr. Pager's report, Dr. Pager concedes that Peoplemark has valid business reasons for considering an applicant's felony convictions before placing the individual with a client.**

As mentioned above, Dr. Pager relied in large part on a study she conducted which was presented in her book, *Marked*. Nevertheless, Dr. Pager omitted several relevant observations

she made in her book that would relate to Peoplemark. First, Dr. Pager noted in *Marked*, that "employment agencies" warrant an independent study given the very different hiring procedures used in such establishments. (Cohen Report p. 4). Dr. Pager made no mention of this distinction in her report. (*Id.*) Second, Dr. Pager's study excluded "'occupations with legal restrictions on ex-offenders – such as jobs in the health care industry, work with children and the elderly, jobs requiring firearms (i.e. security guards), and jobs in the public sector.'" (*Id.* at 5 (quoting Pager Report at 11)). Dr. Cohen noted that these types of employers involve many of the jobs in which Peoplemark places its employees. (*Id.*) Third, Dr. Pager opines that steady employment plays an important role in helping ex-offenders from re-offending. Nonetheless, Dr. Pager did not define "steady" employment nor did she provide any evidence as to whether her findings would apply to a temporary employment agency such as Peoplemark. (*Id.*)

> Moreover, as set forth above, but bears repeating here, Dr. Pager opined:
>
> "In decisions about worker placement, the issue of an applicant's criminal background is a relevant concern. As an employment agency, Peoplemark must identify workers who meet the needs of their employer clients. Given that most employers report a general wariness of hiring individuals with criminal records, it is not surprising that Peoplemark is reluctant to place such applicants."

(*Id.* at 6 (quoting Dr. Pager; Pager draft Bates No: ExpertPager00015)). Despite the cautions and the distinctive nature of Peoplemark as an employer, Dr. Cohen notes that Peoplemark placed ex-offenders unless certain employers specifically requested no ex-offenders. (*Id.* at 13).

Because Peoplemark has valid, legitimate business reasons for considering an applicant's prior felony convictions before placing, summary judgment should be granted in its favor.

**D. The EEOC's Complaint should be dismissed and Peoplemark awarded its fees and expenses as a sanction under Fed. R. Civ. P. 37(b)(2).**

As noted by this Court in its Order dated January 29, 2010 [DE 108 at 3-4]:

> The EEOC refuses to recognize in this appeal, as it has refused to recognize throughout the case, that all parties, including the EEOC, have to litigate within the case management order set by the Court. "[A]dherence to reasonable deadlines is critical to maintaining integrity in court proceedings." *Equal Employment Opportunity Commission v. Autozone, Inc.*, 248 F.R.D. 542, 543 (W.D. Tenn. 2008) (internal quotation marks and citation omitted). The deadlines in the original case management order were generous, in the Court's view. Moreover, the deadlines have already been extended three times, each time upon a motion from the EEOC. Fundamentally, the message of the EEOC in practice in this case has been that it intends to litigate the case on its own schedule, not the Court's. That attitude misunderstands the respective roles of the Court and the litigants.

The EEOC never proffered a timely expert report by Dr. Madden – the report which was due December 31, 2009. A district court can order dismissal in such a situation as this pursuant to Fed. R. Civ. P. 37(b)(2). In *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir.1990), the Court of Appeals for the Sixth Circuit stated that the granting of a default judgment as a sanction, "or entry of default judgment" is not an abuse of discretion if a party has the ability to comply with discovery orders but fails to do so.

The Sixth Circuit has articulated four factors that are relevant in determining whether the grant of a default judgment or dismissal was an abuse of discretion under Rule 37:

> (1) whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's failure to cooperate in discovery; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less dramatic sanctions were imposed or considered before dismissal was ordered.

*Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997). Here, the EEOC's failure to produce its statistical expert's report is certainly the fault and bad faith of the EEOC. As this Court has

recognized, case management order deadlines have been extended three times at the request of the EEOC and it never produced the necessary report to prosecute its case. Peoplemark has been prejudiced by the EEOC's inaction in having to expend huge sums of money to continue to litigate a case in which the EEOC will be unable to prove its disparate impact claim especially after abandoning its initial assertion that there was a blanket policy. Finally, the EEOC has litigated enough Title VII cases under a disparate impact theory to know, without a doubt, that its case rises or falls on statistical evidence. Indeed, it has acknowledged this premise several times.

Because of the EEOC's willful failure to adhere to the case management order deadlines and produce the statistical expert it had designated, Peoplemark respectfully requests that this Court dismiss the EEOC's Complaint with prejudice and award it its attorney fees and expenses.

## CONCLUSION

In summary, Peoplemark moves for summary judgment because it has demonstrated that the EEOC cannot make out a prima facia case of disparate impact discrimination; there is no genuine issue as to any material fact and Peoplemark is entitled to a judgment as a matter of law because a) the EEOC has not identified a specific employment policy or practice; b) the EEOC cannot prove though relevant statistical analysis that whatever the policy is that it is challenging has an adverse impact on African Americans; c) there is no adverse impact on African American applicants with felony convictions; and d) Dr. Cohen's analysis of Dr. Pager's report reveals that the EEOC has failed to meet its burden of setting forth evidence of disparate impact.

In the alternative, Peoplemark has demonstrated that even if a disparate impact exists, the EEOC expert, Dr. Pager, has conceded that Peoplemark has valid business reasons for considering an applicant's felony conviction before hiring the individual for a placement with a client.

Therefore, the EEOC's complaint should be dismissed, and Peoplemark should be awarded its fees and expenses as a sanction, under Fed.R.Civ.P. 37(b)(2).

For all the above reasons Peoplemark respectfully moves this Court to dismiss the EEOC's complaint herein with prejudice and award Peoplemark its attorney's fees and expenses.

Respectfully submitted,

s/Edward R. Young
Edward R. Young (BPR # 008373)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Tel:  (901) 577-2230
Fax: (901) 577-0836
Email: eyoung@bakerdonelson.com

*Attorney for Defendant Peoplemark, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 25, 2010, the foregoing was served on the parties listed below via electronic mail and first class mail, postage prepaid:

Laurie A. Young
Regional Attorney
Laurie.young@EEOC.gov

Deborah M. Barno (P44525)
Supervisory Trial Attorney
Deborah.barno@EEOC.gov

Omar Weaver (P58861)
Trial Attorney
Omar.weaver@EEOC.gov

Equal Employment Opportunity Commission
Detroit Field Office
Patrick V. McNamara Building
477 Michigan Avenue, Room 865
Detroit, Michigan  48226
313-226-3407

s/Edward R. Young